FILED

2005 Sep-26  PM 04:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

BEVERLY CHAMBLESS,                       )
                                         )
                    Plaintiff,           )
                                         )          CASE NO.:
v.                                       )
                                         )          CV-00-RRA-3610-NE
LOUISIANA-PACIFIC CORPORATION,           )
                                         )
                    Defendant.           )

CONSOLIDATED WITH

BEVERLY CHAMBLESS,                       )
                                         )
                    Plaintiff,           )
                                         )          CASE NO.:
v.                                       )
                                         )          CV-02-RRA-3146-NE
LOUISIANA-PACIFIC CORP.,                 )
                                         )
                    Defendant.           )

**Memorandum of Opinion**

## I.      INTRODUCTION

This is a civil action filed by the Plaintiff, Beverly Chambless against the Defendant, Louisiana-Pacific Corporation ("LP").  The Complaint in CV-00-RRA-3610-NE, was filed on December 15, 2000, and alleges "hostile work environment sexual harassment" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); retaliation in violation of Title VII (Count II); negligent and/or wanton and malicious training, supervision and retention (Count III); sex discrimination in violation of Title VII in failure to promote the plaintiff (Count IV); and age discrimination in violation of the Age Discrimination in

Employment Act ("ADEA") (Count V).  The Plaintiff also asserts that her rights under 42 U.S.C. § 1981a were violated.  However, none of the Plaintiff's Counts allege a violation of this act.  It is cited only generally at the beginning and end of the Complaint.

On December 23, 2002, the Plaintiff filed another suit against the same Defendant (CV-02-RRA-3146-NE), claiming only one count of retaliatory discharge in violation of Title VII.  By order of April 29, 2005, these two cases were consolidated before the undersigned.

The case is presently before the Court on the restated motion of the Defendant to dismiss in part, or, in the alternative, for partial summary judgment.  (Doc. 34).  For the reasons stated herein, the motion will be **GRANTED, in part** and **DENIED, in part**.

## II.   STANDARD

Because the Court, in reviewing the instant motion, has considered evidence which the parties have submitted, the instant motion is converted to one for summary judgment under Fed. R. Civ. P. 12(b).  *See Day v. Taylor,* 400 F.3d 1272, 1275 -1276 (11th Cir. 2005) ("The district court generally must convert a motion to dismiss into a motion  for summary judgment if it considers materials outside the complaint.")

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party.  Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©. However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir.

2004).

III.   **FACTS**[1]

On August 8, 2000, the Plaintiff filed a charge of Discrimination with the EEOC.  In

that charge the box was checked stating that the cause of her discrimination was "sex".  The

Plaintiff alleged:

> I was hired by [LP] in October 1994 as a cleaning person.  Today I am a crane
> operator.  On July 25, 2000, I applied for a position as Shipping Supervisor.
> On July 26, 2000, Plant Superintendent Tim Terry issued me a written
> discipline for allegedly not following company policy when I was ill.  This new
> policy had not been disseminated.
>
> On August 4, 2000, I learned that Heath Johnson, a less qualified male, had
> received the position.  On that day, Tim Terry informed me that the job
> requirements for the position had been changed so that no one who had
> received a write-up within the past 180 days would be considered.
>
> I believe that I was discriminated against on the basis of my sex, female, in
> violation of title VII of the Civil Rights Acts of 1964, as amended.  I believe
> that the reason given by the company for my non-selection was pretext.
>
> I also believe that the above-named employer subjects females and Blacks to a
> hostile work environment on the basis of their sex and race, respectively.

*August 8, 2000, EEOC Charge*, at 1.  The EEOC issued a right to sue on this charge on

September 19, 2000.  *EEOC Right to Sue of September 19, 2000*, at 1.

The Plaintiff filed her second charge with the EEOC on September 26, 2000.  The

Plaintiff contends that this second charge was actually an *amendment* to her August 8, 2000,

charge. *Plaintiff's Brief and Response to and Opposition to the Defendant's Motion to Dismiss*

---

[1]The facts are presented here, as the Court must, in the light most favorable to the non-
movant.  Some of the facts presented may be disputed.  The Court will note disputes where it
deems appropriate.

*in Part, or in the Alternative, Motion for Partial Summary Judgment*, at 3.  This charge does

not state that it is an amendment to a previous charge.

In this second charge, under the section for "Cause of Discrimination", the boxes for

Sex, Age, and Retaliation are checked.  In this charge the Plaintiff alleges:

I.       I have been employed with Respondent since October 1994, and I have
W-2s to prove this, contrary to Respondent's response to my August 2000.  I
have been denied the opportunity to cross-train, among other discriminatory
practices concerning terms and conditions of my employment, because of my
sex.  Throughout my employment, other females and I have been subjected to
sexual harassment and a sexually hostile working environment.  I have also
witnessed racial harassment, including but not limited to the use of racial
epithets on my African-American coworker's wafer bundles.  I have complained
repeatedly about Respondent's discriminatory treatment of all females and of
African-American men.  The Respondent has intensified its harassment in
retaliation for my complaints in an effort to force me out of the workplace,
including but not limited to retaliation for filing my previous charge of August
2000.

II. Examples of the sexual and racial harassment include but are not limited to
the following:

Henry Richards, my supervisor, and Hugh Tolbert, the Human Relations
director, hired me, they said, as a "cleaning lady."  I was in this position for
nine months before they finally promoted me to painter-strapper.  I asked to
be promoted from cleaning lady from December 1994 until my promotion nine
months later.  Males were promoted from the entry level cleaning position
within days or weeks.

Respondent fostered a sexually hostile atmosphere: for example, Supervisor
Henry Richards, other supervisors and co-workers targeted me for sexual
touching, sexual jokes, and propositions.  When I did not participate in sexual
conduct with my supervisors and co-workers, their treatment of me became
hostile because of my gender.  I have not welcomed this conduct and have
objected to the conduct throughout my employment.

There are many examples I could provide of the sexually degrading atmosphere
created and fostered by supervisors.  For example, I was among six other
employees, all males, who were assigned to clean up the plant for a visit from
a Ms. Linda Lindquist.  Eric Thompson, my supervisor at the time, was present

4

while the men called her, among other things, a "bitch" and "whore." My supervisor laughed throughout the men's use of sexual epithets. Finally I could no longer take it and I said to them all that there was a lady present and they should stop their foul talk. The men refused to work with me, and my supervisor instructed me to complete the cleaning job by myself.

After I married and became pregnant, I was the target of repeated and merciless teasing about which of my supervisors of co-workers was the father of my baby. I was subjected to burdensome work assignments and dangerous conditions because Respondent wanted to force me out during my pregnancy. I saved up years' worth of vacation for my leave when my baby was born. My supervisor told me he was not sure if I would have a job after I took my accumulated paid leave and two weeks without pay as my maternity leave. At about the same time, a male who suffered a heart attack had a job created for him so that he could continue his employment.

Many males engaged in sexual harassment. One in particular, Jerry Johnson, harassed me to the extent that I filed a complaint with the company for Jerry Johnson's conduct. He groped me, joked about me having sex on the job, which was a lie, and put his head between my legs without my consent or invitation. He instigated the jokes about the paternity of my youngest child. He asked various males who know me on the job how their baby was doing. When I complained about Johnson, RoseScott with Human Relations, Time Terry, assistant plant manager, and Ricky Benefield, my C Shift Supervisor, accused me of sexually harassing Al Gordon because I touched his shoulder in sympathy on one occasion and said to him I would keep him and his family in my prayers. This is just one of the many examples I could provide of the respondent retaliating against me for complaining about sexual harassment.

I have additionally witnessed the word "nigger" being written on the wafer bundles of an African-American co-worker. Supervisors and co-workers have created a racially hostile work environment for this employee. This employee and I, both targets of harassment, have a practice of avoiding too much contact with one another because I fear, and I believe he fears, that we will be even more abused if we are perceived as friends.

I have observed that new hired who are African-American males or female of any race are targeted to be forced out of the workplace. African-Americans are subjected to racial jokes and racial epithets such that some new hires leave the same day in disgust. Others are forced out soon after they are hired. None of these new hires are given a chance to progress up the line of positions. I have objected to the racially discriminatory atmosphere only to be targeted for more intense harassment myself.

I believe that my most recent injury is work-related, but workers' compensation

5

has been denied to me: when I needed medical leave this year for excruciating chest pains, ultimately determined to be caused by severe damage to my pectoral muscles, I was disciplined for failing to follow procedure on absences. I called in every day two hours before shift when I was to be absent, as required. I also submitted doctors' notes. Nevertheless, at approximately the same time I submitted my name to be considered for a supervisory position, I was written up, as I understood it, for failing to disclose to the HR director that on more than one occasion I had been excused from my shift for severe chest pains that disabled me from operating the crane, my position at this time, I am at a loss to understand why Respondent would write me up. I do not believe I violated any policy as I substantiated all of my absences during this period. Even if I did, it was because the stress of the sexually hostile environment had interfered with my ability to perform my duties.

My mental health has been compromised by years of being the target for abuse because of my sex. The above represents only a few examples. I have been belittled and undermined daily by my supervisor Wayne Wilford. Although I have the best safety record as crane operator, for example, Wilford constantly harangues me about whether I can perform the job. This harassment has so interfered with my ability to work that I have become ill, including but not limited to anxiety, nightmares about my supervisors, vomiting and other physical manifestations of emotional distress. I dread coming to work and fear making the slightest error because I can not afford to lose my job.

Some of the culprits of the discriminatory conduct who are supervisors are including but not limited to Wayne Wilford, Tim Terry, Henry Richards, Ricky Bennefield, Eric Thompson, Mike Adams, Fred Hargrove, Richard Southard, Jr., Richard Southard, Sr., and Jerry Johnson. Mason Halacker, in Human Resources, has failed to respond to my complaints adequately and therefore fosters the sexually hostile environment.

III. I request that a full investigation be made into my employer. I have personal knowledge as to the Hanceville plant. Fred Hargrove, who is district manager now, was plant manager when I began my employment. He had an adulterous affair with his secretary, which the facts may show was sexual harassment. As Hargrove, who had full knowledge and in fact fostered the hostile environment in Hanceville, is now district manager, I have reason to believe that any plant he oversees may be discriminating on the basis of sex and race. Additionally, I believe the corporation is failing to adequately train supervisors on its sexual harassment policy. On information and belief, Respondent discriminates against females of all races and African-American male applicants on the basis of sex and race with respect to promotions, hiring, salary, benefits, job assignments, and other terms and conditions of

6

employment; on information and belief, the class-wide discrimination is not limited to the Hanceville facility but is part of a systemic, company wide pattern and practice.

*September 26, 2000, EEOC Charge*, at 1-3.  The EEOC issued a right to sue on this Charge

on April 2, 2001.  *EEOC Right to Sue of April 2, 2001.*

The Complaint in CV-00-RRA-3610-NE alleges the following:

5.     The plaintiff began working for LP in 1994; she was told by management that she was hired to be a "cleaning lady."  The entry level position is otherwise known as "laborer."

6.     Throughout her employment, numerous male members of management as well as co-workers have subjected Plaintiff to a hostile environment because of her gender, including but not limited to, sexual touching, ridicule for her pregnancy, ridicule for her menstrual cycle, hostile comments and behavior, and retaliation for her repeated complaints about sexual harassment she and other females suffered and racial harassment she witnessed African-American employees suffering.

7.     She did not participate in, welcome or invite any of the sex harassment that occurred throughout her employment.  Throughout her employment, she objected and was retaliated against for doing so.

8.     On information and belief, LP provides applications to females considered pretty but informs females not considered attractive that LP is not accepting applications.

9.     Plaintiff witnessed racial harassment at LP, including, but not limited to, racial slurs written on an African-American co-worker's equipment.  When Plaintiff complained about racial harassment, LP intensified in retaliation the sexually hostile environment she has been forced to endure.

10.     White male employees have a practice of complaining to supervisors that they do not want to work with "niggers" or women.  These white males are not appropriately disciplined for using this racial epithet.  When white males were assigned to work with Plaintiff, they disappeared and forced Plaintiff to do all of the work assigned to the work group.  These employees were not disciplined by the supervisor to return to complete the job; rather, on more than one occasion Plaintiff's supervisor has informed Plaintiff to perform all of the work duties of the team herself.

11.     LP discriminates in its promotion practices.  For example, despite the pattern of promoting males such as Brian Creel and David Rouse from entry level to utility positions within a few months of employment, Plaintiff did not similarly advance.  When she asked her supervisors about advancing, she was told that she was hired to clean and that "women were better at cleaning," so she was required to remain in that position.  She was also told by management that at other LP plants, her job was held by males, so she should be grateful for the opportunity.

12.     Although she was told she could learn other jobs once she finished her cleaning duties, when she attempted to learn a job in the knife room, she was reprimanded.  She was banned by her supervisor, with the approval of management, from talking to any of the operators and supervisors except for her immediate supervisor.

13.     Her supervisor also reprimanded her shortly thereafter when, because her car was not functioning, she had waited for a ride from her co-worker who worked in the air-conditioned knife room.

14.     During this period, males at the plant, including males in management, contributed to the creation of a sexually hostile working environment by generating untrue rumors about Plaintiff's sex life.  Her supervisor punished her for these rumors by requiring her not to go on break or lunch with her two friends at the plant.

15.     She made repeated requests to management for advancement, such as to positions that came available in shipping, and in the knife room; she even offered to move to other LP facilities to advance.  She was alternately given false assurances that she would be interviewed or considered, harshly denied any consideration, or rebuffed by upper management with the instruction to speak with her immediate supervisor.  On one occasion, she was told that she could not advance until a position came available on day shift because management was worried about her being a single mother and therefore not being able to perform the job.  Plaintiff assured management that her status as a single mother would not interfere with her job performance on either day or night shift.

16.     A female hired approximately the same time as Plaintiff was also denied the opportunity to advance in the manner similarly situated males advanced. A supervisor discouraged this female and Plaintiff from seeking advancement and informed them that no consideration would be given to either of them because they were women.

8

17.     The male human resources director told Plaintiff that other females hired as cleaning ladies were perfectly happy to stay in that position.

18.     She submitted a written request, as instructed by the Equal Employment Opportunity Commission whose advice she had sought in the summer of 1995, for A-shift strapper or B-shift utility.  The male human resources director tried to talk her out of her submitting the request.

19.     She submitted the written request and was finally permitted to train as a painter-strapper in August 1995 at the Hanceville plant at the rate of $6.00 per hour.  She was told that she had to train the new female who would occupy her cleaning lady position.  By this time, almost all the employees, all males, on utility had less seniority than Plaintiff.

20.     She performed well as painter/strapper and was complimented by member of management Fred Hargrove, who informed her that she would receive a fifty cent raise.

21.     The sexually hostile environment continued, however.  During this period as painter/strapper, Jerry Johnson constantly teased Plaintiff about whether she was having a sexual relationship with another employee.  He made numerous sexual comments to Plaintiff and about Plaintiff.

22.     In December 1995, Plaintiff was going to use her vacation check to take out her children to celebrate.  She had been told to return to the plant to sign for her check.  When she did, Jerry Johnson was present.  He made sexual remarks, which Plaintiff ignored as she bent over to sign for her check.  Johnson hiked up her skirt and attempted to put his head between her legs.  Plaintiff slapped Johnson and told him he was sexually harassing her.  He and another male employee laughed in response.  She left in tears and was so fearful to return to the office to obtain her vacation check that she signed a paper to allow one of her co-workers to pick it up on Plaintiff's behalf.

23.     Plaintiff was afraid to report the harassment because during this time a female employee was fired who had been harassed by the assistant plant manager.

24.     Additionally, a high ranking member of management, known to refer to female employees as "bitches" or "stupid bitches," had sexually harassed one of Plaintiff's fellow employees by telling this female, among other things, that he was having "wet dreams" about her.  Plaintiff, in an effort to protect her friend, told the male manager that what he was doing was sexual harassment

9

and should stop.  In retaliation, this manager referred to Plaintiff as a "fat bitch" and a "bag lady" and threatened to write her up for trying to help a fellow employee gather materials that had fallen.

25.    This manager also talked with Plaintiff and her fellow female employee about how a picture of mountains reminded him of a woman and "how nice it would be to climb in."  Males at the plant circulated the rumor that Plaintiff and this fellow female employee were lesbians.

26.    This manager also told Plaintiff when she requested to be promoted to the shipping department that "there can't be two women in the same department."

27.    Another example of the hostile treatment occurred when plaintiff asked to be on the plant baseball team.  She wanted to be the pitcher.  She was told it was a men's league. Members of management laughed at her for seeking to be on the team and told her she could be a cheerleader.

28.    Plaintiff married a fellow employee from another department and later her third child was born of this marriage.  By this time she had moved to a different position in the knife room.

29.    During her pregnancy in 1997 she was ridiculed and ostracized by management because of her pregnancy.  Human Resources personnel asked Plaintiff why she did not quit.  Management required her to perform the most difficult and physically demanding tasks in the knife room.

30.    Management permitted and contributed to rumors circulated in the plant about the paternity of Plaintiff's third child.  Plaintiff receive obscene phone calls at home that her caller identification indicated came from LP. Plaintiff changed her telephone number and requested that her supervisors not disclose it.

31.    Her health was compromised during her pregnancy by the sexual harassment and retaliation she was experiencing.  Her physician's notes were discarded by management rather than honored.

32.    Plaintiff save up years' worth of vacation for leave when she had her baby.  Despite the valid use of her vacation time, her supervisor warned her that she might not have a position when she returned from leave with her newborn.  At approximately the same time, a male who suffered a heart attack had a job created for him so that he could continue his employment without jeopardizing his health.

33.    In 1998, when Plaintiff discovered Jerry Johnson was one of the perpetrators of the rumors about the paternity of her child, she submitted a complaint on Johnson about his conduct.  She learned that Johnson had also made sexually suggestive remarks to her stepdaughter when she called the plant in search of her father.

34.    In preparing for an inspection to be headed up by a female, LP male employees ridiculed this female inspector by referring to her as a "bitch." When Plaintiff requested that the male employees not use foul language in her presence, they abandoned their tasks and left her to do their work with the approval of their supervisor.

35.    One example of LP's retaliation against Plaintiff occurred when the assistant plant manager, a member of human relations, and her supervisor, all of whom knew of her repeated complaints about the sexually harassing environment she was being forced to endure, accused her of sexual harassment because she had placed her hand on the shoulder of a male employee when she told him that she would keep him and his family in her prayers.

36.    The sexually hostile environment additionally includes members of management playing pornographic games on their computers with other male employees.  Pornographic magazines and sexually suggestive calendars are at the plant facility for male use and encourages the males to engage in sexually harassing conduct against Plaintiff and other females.

37.    Plaintiff has suffered throughout her employment from denials of advancement opportunities. From 1996 through 1998 Plaintiff unsuccessfully attempted to advance by getting certified to drive a fork lift.  Management refused to provide the training for certification.  In 1998, she and three males requested the certification training.  The three males obtained the training and advanced but she was denied the opportunity.

38.    In the fall of 1999, she attempted to be promoted to a job in the Lab department.  This position was given to Britt Reid, a male whose original hire date was contemporaneous with Plaintiff's.

39.    She eventually was permitted to operate the crane in 1999.  This is a demanding job that Plaintiff has performed well.  She has the best safety record of all the crane operators, but she has been continually ridiculed and belittled by her supervisor Wayne Wilford, who has been a known perpetrator of the hostile environment throughout her employment.

11

40.     While on this job, she developed severe injury to her pectoral muscles as a result of the shaking of the throttle she uses to operate the crane in combination with the stress and anxiety she is experiencing because of the hostile environment.

41.     In the spring of 2000, the injury to her pectoral muscles was so disabling it prevented her from doing her job as crane operator.

42.     She was required to be on leave on numerous occasions to visit physicians and was instructed by physicians not to operate the crane until she had healed.

43.     During this time, she applied for the position of Shipping Supervisor. After submitting her application, plant superintendent Tim Terry issued her a written discipline for violating company policy during her leave for the pectoral muscle injury.  She was given a copy of the policy for the first time the day she was written up.  Plaintiff disagrees that she violated this policy.

44.     Even if she violated the policy, the stress, anxiety and mental anguish she was experiencing from working for more than five years in a sexually hostile environment compromised her ability to comply with the policy.

45.     In August 2000, Plaintiff learned that a less qualified male received the position.  At that time, Terry informed Plaintiff that those receiving write ups within the previous six months had not been considered.

46.     Terry is one of the members of management who has known about the sexually harassing environment, Plaintiff's complaints about this environment, and who has failed to make a prompt, remedial response.

47.     Once LP learned of the EEOC charge Plaintiff filed in August 2000, it retaliated against her with abusive supervision and continuing the sexually harassing working environment.

48.     Plaintiff has experienced emotional harm because of the sexual harassing environment and management's failure to remedy the sexual harassment.

*Complaint in CV-00-RRA,* at 2-11.

## IV.     ANALYSIS

### A.     Section 1981 Claims

The Defendant contends that the Plaintiff makes claims pursuant to 42 U.S.C. § 1981.

Section 1981(a) provides in pertinent part: "All persons within the jurisdiction of the United

States shall have the same right in every State and Territory to make and enforce contracts

. . . as is enjoyed by white citizens." *42 U.S.C. § 1981.* However, this section appears in none

of the Counts of the complaint.  In fact, it appears only twice in the Complaint.  The first

time it appears is in the statement of this court's jurisdiction.  *See Complaint*, at 1.  The

second time it appears is in the prayer for relief where the Plaintiff asks this Court to "Issue

a declaratory judgment that the employment policies, practices, procedures, conditions, and

customs of the defendants are violative of the rights of the plaintiff as secured by . . . 42

U.S.C. Section 1981a.  All of the Counts of the Complaint *expressly* provide that they are

brought under Title VII (Counts I, II, and IV), the ADEA (Count V), or state law (Count III).

The Plaintiff insists that she makes a "retaliation" claim under Section 1981, but  the only

place that is alleged is in *Plaintiff's Memorandum and Points of Authority in Response to and

Opposition of the Defendant's Motion to Dismiss*, at 4.

The fact that the count to which Section 1981 applies must be pointed out to the

Court by a separate instrument is evidence that the complaint itself does not properly allege

a Section 1981 claim.  On that basis alone the Section 1981 claims are due to be dismissed.

In addition, the Section 1981 claims fail because the Plaintiff's contention that she was

retaliated against because of her complaints of racial discrimination do not rise to the level

of a Section 1981 claim.  The Plaintiff contends that this Circuit, as well as others, "has [sic]

long recognized a white individual's ability to bring a claim under § 1981 in certain

circumstances."  *Plaintiff's Memorandum and Points of Authority in Response to and*

13

*Opposition of the Defendant's Motion to Dismiss*, at 4.  That contention is true where the Plaintiff has been discriminated against because of race, even if it were not necessarily the Plaintiff's own race at issue.  *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986) (white Plaintiff maintained a § 1981 claim alleging discrimination because of marriage to a non-white).

However, in this case the alleged retaliation is not because of the Plaintiff's race. Instead, it is because of the Plaintiff's complaints of alleged racially discriminatory conduct by the Defendant against *other* employees.  The retaliation complained of is "failing to remedy the sexual harassment suffered by Plaintiff."  The allegations of the complaint, even taken as true, simply to not rise to the level of retaliation based upon race.  Summary Judgment will be **GRANTED** as to the Section 1981 claims.

**B.    The Failure to File Timely Charges With the EEOC**

Because Alabama is a non-deferral state, the Plaintiff was required to file her Charge of Discrimination with the EEOC within 180 days of the alleged unlawful employment action.  42 U.S.C. § 2000e-5(e)(1).  This would directly effect her federal claims of hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); retaliation in violation of Title VII (Count II); sex discrimination in violation of Title VII in failure to promote the plaintiff (Count IV); and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") (Count V).  The Plaintiff filed her initial charge of discrimination on August 8, 2000; consequently, any incidents after February 10, 2000, occurred within the 180-day filing period. The Defendant concedes that "[the Plaintiff] has asserted a timely claim only as to LP's denial of her promotion to the

14

Shipping Supervisor position, since that occurred in August 2000, within 180 days of filing her first EEOC charge." *Memorandum in Support of Defendant's Motion to Dismiss in Part*, at 8. The Defendant contends that the remaining incidents are time-barred. In response, the Plaintiff contends that these incidents are part of a pattern or series of discriminatory acts and are therefore preserved by the continuing violation doctrine.

The Eleventh Circuit has said:

> In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court rejected the application of the continuing violation doctrine in hostile work environment cases. *See Shields v. Fort James Corp.,* 305 F.3d 1280, 1281-82 (11th Cir.2002). Prior to *Morgan,* we distinguished between the present consequences of a one-time violation and the continuation of the violation into the present to determine whether a court could consider acts that occurred before the filing period for the purposes of determining liability. See, e.g., *Thigpen v. Bibb County, Ga., Sheriff's Dep't,* 223 F.3d 1231, 1243 (11th Cir.2000). In *Morgan,* however, the Supreme Court simplified the limitations inquiry in hostile work environment cases. The Court instructed that a hostile work environment, although comprised of a series of separate acts, constitutes one "unlawful employment practice," and so long as one act contributing to the claim occurs within the filing period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan,* 122 S.Ct. at 2074.

*Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003).

The Plaintiff's numerous allegations of harassment constitute an allegation of one unlawful employment practice: the hostile work environment created by the harassing conduct of LP's employees.  In *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003), under very similar circumstances, the Eleventh Circuit determined that the Plaintiff's numerous allegations of harassment constituted an allegation of one unlawful employment practice: the hostile work environment created by the harassing conduct of the Defendants employees and customers.  *Id.*  In *Watson*, because the defendant conceded that six alleged

15

incidents of harassment occurred within the filing period, the Court held that the entire time period of the harassment may be considered for the purposes of determining liability. *Id.* Accordingly, in the instant case, if at least one incident of alleged harassment occurred within the filing period, the denial of promotion, the entire time period of the harassment may be considered for the purposes of determining liability.

The Defendant concedes that one *incident* in the Complaint, the denial of the promotion to Shipping Supervisor, is alleged to have occurred during the statutory period. However, the Defendant disputes that this is part of the same "harassment" for the purpose of encompassing the other incidences. It insists instead that the test is whether "'the pre-- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (U.S. 2002) (quoting the district court opinion). While these factors, laid out in *Morgan,* are not a test the Court set out for all cases, the Court did state that "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 120 (U.S. 2002).

Viewing the facts in the light most favorable to the Plaintiff reveals that the two acts were alleged to have occurred during the statutory period. The Plaintiff was denied a promotion to the Shipping Supervisor position on August 4, 2000. *EEOC Charge of August 8, 2000.* The Plaintiff was told that she was denied a promotion because she had been "written up". The Plaintiff was written up on July 26, 2000, because of alleged violations of

16

company attendance policies. *Deposition of Plaintiff*, at 208-210. The Plaintiff testified and contends that the write up and policies behind the write up were attempts to discriminate against her and furthering of a hostile work environment. These led directly to her denial of the promotion at issue. She was written up by Plant Superintendent Tim Terry. *EEOC Charge of August 8, 2000; Chambless Depo.*, at 209.

The other acts outlined in the Complaint occurred at various times. For example, Chambless was pregnant during 1997; thus, any harassment related to plaintiff's pregnancy would not have occurred within the statutory time period. *Chambless Depo.*, at 75. Chambless testified in her deposition that the alleged comments regarding her menstrual cycle occurred in 1998. *Complaint*, ¶ 6; *Chambless Depo.*, at 261. In addition, Chambless testified that alleged comments about giving applications to females considered pretty were made in 1997. *Complaint*, ¶ 8; *Chambless Depo.*, at 300. Racial slurs or epithets were related to plaintiff by hearsay and allegedly witnessed by plaintiff in 1995 or 1996. *Complaint*, ¶¶ 9-10; *Chambless Depo.*, at 302, 310.

Plaintiff testified that many of the allegations in her Complaint occurred in 1995. For example, the following actions all allegedly occurred in 1995: failure to promote plaintiff from the clean-up crew position, (*Complaint*, ¶ 11; *Chambless Depo.*, at 269); statements regarding plaintiff being hired as a "cleaning lady," (*Complaint*, ¶ 11; *Chambless Depo.*, at 269); alleged reprimands for being in the knife room, (*Complaint*, ¶¶ 12-13; *Chambless Depo.*, at 311); rumors about her sex life, (*Complaint* ¶ 14; *Chambless Depo.*, at 272-3, 313); alleged punishment for those rumors, (*Complaint* ¶ 14; *Chambless Depo.* at 272-3, 313); requests to advance and move to other LP plants, (*Complaint* ¶ 14; *Chambless Depo.*, at 272-

3, 313); statements about worries about her being a single mother,  (*Complaint*, ¶ 15, *Chambless Depo.*, pp. 258, 272-3); comments discouraging plaintiff and another female from seeking advancement, (*Complaint* ¶ 14; *Chambless Depo.*, at 272-3, 313); comments telling plaintiff that other females were happy in the "cleaning lady position," (*Complaint*, ¶¶ 16-17; *Chambless Depo.*, at 316-7); and  requiring plaintiff to train her replacement on the clean-up crew.  (*Complaint*, ¶ 19).

In addition to the above acts, which allegedly occurred in 1995, Chambless also asserts as evidence of a hostile environment that an inappropriate touching incident with another employee, Jerry Johnson, occurred in December 1995.  *Complaint*, ¶¶ 21-22, *Chambless Depo.*, at p. 272.  Alleged comments by a high ranking member of management using derogatory terms to refer to women generally, and Chambless specifically, and sexually explicit comments about a co-worker occurred in 1995 or 1996.  *Complaint*, ¶¶ 24-25; *Chambless Depo.*, at 322-4.  This manager, Richard Southeard, Sr., also allegedly stated that two women could not work in the same department in 1995 or 1996.  *Complaint*, ¶ 26; *Chambless Depo.*, at 325.

As further evidence of a hostile environment, Chambless alleges that she was not able to play on the LP baseball team, which occurred in 1997.  *Complaint*, ¶ 27, *Chambless Depo.*, at 326-7.  In addition, plaintiff alleges that she received obscene phone calls from LP during this time.  *Complaint*, ¶ 30; *Chambless Depo.*, at 290.  Chambless also alleges in support of her hostile environment claim, a complaint raised against her for sexual harassment, which occurred in 1998.  *Complaint*, ¶ 35; *Chambless Depo.*, at 334.  Plaintiff alleges that certain actions occurred during her pregnancy, which contributed to the hostile environment at LP.

*Complaint*, ¶¶ 29, 30, 31, 32, and 33.  As stated on the face of her Complaint, Chambless was pregnant in 1997.  *Complaint*, ¶ 29.   Alleged rumors as to the paternity of Chambless's child occurred prior to and after the birth in 1997.  *Complaint*, ¶¶ 31, 33.

Chambless also alleged that the fact that employees had made derogatory comments about a visiting female inspector supported her hostile environment claim.  This alleged incident happened in 1996 or 1997.  *Complaint*, ¶ 34; *Chambless Depo.*, at 331.  Chambless also asserts that male employees played pornographic games, looked at pornographic magazines and suggestive calendars as evidence of the hostile work environment to which she was subjected.  According to Chambless's testimony, these acts occurred in 1994-1998 and stopped in 1998.  *Complaint*, ¶ 36; *Chambless Depo.*, at 336-7.   In addition, Plaintiff's allegations that she was not allowed to train for the forklift job; that she was not promoted to the lab job and was belittled by her supervisors all are alleged to have occurred in 1999.  *Complaint*, ¶¶ 37, 38, 39.

After careful review, the Court is convinced that the incidents which were reported within the statutory period are part of the same unlawful employment practice as those which occurred before the reporting period.  The nature of the timely reported events are those which directly effect the plaintiff's job, career, or advancement in the form of write ups or denials of promotions.  Similarly, several of the untimely reported events also effect the plaintiff's job , career, or advancement, such as failure to promote plaintiff from the clean-up crew position, statements regarding plaintiff being hired as a "cleaning lady," reprimands for being in the knife room, rumors about her sex life, punishment for those rumors, requests to advance and move to other LP plants, statements about worries about her being a single

mother, comments discouraging plaintiff and another female from seeking advancement, comments telling plaintiff that other females were happy in the "cleaning lady position," requiring plaintiff to train her replacement on the clean-up crew, that she was not allowed to train for the forklift job, that she was not promoted to the lab job, and that she was belittled by her supervisors. The Plaintiff's hostile work environment claim is timely.

However, the Plaintiff does not argue, and this Court has not found precedent that the "continuing violation" theory applies to retaliation claims. None of facts giving rise to this claim was alleged to have occurred after February 10, 2000. Accordingly, as to the retaliation claim (Count II), the Motion for Summary Judgment will be **GRANTED**. The Defendant concedes that Counts IV and V are timely filed.

### C. Whether the Plaintiff Timely filed Her Suit Within 90 Days of her Receipt of a Right to Sue.

The ADEA provides that: "If a charge filed with the Commission [EEOC] under this chapter is dismissed . . ., the Commission shall notify the person aggrieved. A civil action may be brought under this section . . . against the respondent named in the charge within 90 days after the date of the receipt of such notice." 29 U.S.C.A. § 626(e). Under the ADEA, unlike Title VII, the plaintiff need not wait until receipt of a Notice of Right to Sue, but may file suit after 60 days from the filing of the EEOC charge. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1100 (11th Cir. 1996). The only charge to mention an age discrimination claim was the second charge, filed on September 26, 2000. The ADEA claim (Count V) was filed on December 15, 2000. Accordingly, the Plaintiff filed her ADEA claim more than 60 days after her charge. Although a Plaintiff may be time barred from filing an ADEA claim if it is not

filed within 90 days of receipt of a right to sue, the ADEA count was filed well in advance of the right to sue ever being issued.  The ADEA claim (Count V) is timely.

The question remains as to whether Count I, the hostile work environment claim, is time barred.  Title VII provides that: "If a charge filed with the Commission [EEOC] . . . is dismissed by the Commission, . . . the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge."  42 U.S.C.A. § 2000e-5(f)(1).  The Plaintiff's first charge alleged discrimination based on sex.  It also states that she "believe [sic] that the above-named employer subjects females and Blacks to a hostile work environment on the basis of their sex and race, respectively.  The only *specific fact* mentioned was the denial of the position as Shipping Supervisor.  The charge does not say that the *Plaintiff* feels that *she* has been subjected to a hostile work environment.  The law in this Circuit does not force the Plaintiff to state every possible fact supporting his or her Title VII action in an EEOC charge. *See Chandra v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000).

> The filing of an administrative complaint with the EEOC is ordinarily a jurisdictional prerequisite to a Title VII action. A Title VII action, however, may be based "not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination."

*Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000).  In *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000), cited by the Plaintiff, the Eleventh Circuit analyzed a similar situation as follows:

[The Plaintiff's] EEOC filing reflects an intention to pursue a retaliation claim,

21

but there is no reference to a national origin claim. In his Charge of Discrimination, [the Plaintiff] checked the retaliation box and stated in paragraph one of the "particulars" section that he was a person with a disability and that he had "complained about discrimination." [The Plaintiff] explains this in the third paragraph, stating that he believed he was "discriminated and retaliated against in violation of Title I of the Americans with Disabilities Act and the Florida Human Rights Act (Chapter 760)." Nothing in his EEOC filing mentions discrimination based on national origin, any complaint about such discrimination, or a claim under Title VII. We must conclude, therefore, that a reasonable investigation based on the EEOC charge did not and would not encompass retaliation based on complaints about national origin discrimination.

*Chandra*, 234 F.3d at 1225.  The court then held that such claims were barred as not having been included in the Charge.  *Id.*

Similarly, here, the initial charge states specifically that the alleged discrimination took place on one date–August 4, 2000.  It specifically mentions only one factual event–the denial of the promotion to Shipping Supervisor.  Lastly, the charge does not specifically state that *the plaintiff* has been subjected to a hostile work environment.  Based on these facts, a reasonable investigation based on the EEOC charge would not encompass a hostile work environment claim against the plaintiff.

The Plaintiff filed the instant suit within 90 days of the EEOC issuing the Right to Sue on this Charge of Discrimination.  The instant suit is replete with allegations of hostile work environment sexual harassment *against the Plaintiff*.  At the time this suit was filed, the Plaintiff had filed a second Charge of Discrimination[2] that contained numerous allegations of hostile work environment sexual harassment as to the Plaintiff.  However, the Plaintiff had not yet received a right to sue on this second Charge of Discrimination.  The right to sue was

---

[2]The Plaintiff, again, contends that this is an amendment to the original charge.

22

not issued until April 2, 2001–almost four months after the Complaint had been filed.

The Defendants cite *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563 (11th Cir. 1987) for the proposition that Plaintiff had no authority to sue on the hostile work environment claims because they had no right to sue at the time they filed the Complaint.  Since then, however, a right to sue has been issued that encompasses these claims.  The Defendants did not move to dismiss these claims until *after* the second right to sue was issued.  To dismiss now because *at one time* the Plaintiff did not have the right to sue, or because the Plaintiff did not seek leave to amend to add claims *already contained within her complaint*, seems pointless.  It is undisputed that, after the second right to sue was issued the Plaintiff could have brought a second action containing the very claims in the current action.  The Defendants have cited no case under these circumstances requiring dismissal or amendment of the Complaint. Neither is appropriate.

D.      State Law Claims

A two year statute of limitations governs the state law claims contained in Count III. Ala. Code §§ 6-2-38.  The Plaintiff filed her Complaint on December 15, 2000.  All conduct alleged to have occurred prior to December 15, 1998, is therefore time-barred.  Summary Judgment will be **GRANTED** as to all such conduct alleged in Count III.

V.      CONCLUSION

For the reasons stated above the Motion for Summary Judgment will be **GRANTED** as to Count II, and will be **GRANTED** as to Count III regarding all conduct  alleged to have occurred prior to December 15, 1998.  In addition, Summary Judgment will be **GRANTED** as to all of the Plaintiff's Section 1981 claims.  It will be **DENIED** in all other respects.

23

**DONE** and **ORDERED** this 26th day of September, 2005.

ROBERT R. ARMSTRONG, JR.
UNITED STATES MAGISTRATE JUDGE